# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| WESTERN UNION COMPANY and WESTERN UNION, LLC, | ) ) ) |
| Plaintiffs, | ) ) Case No. 17-CV-00280 |
| vs. | ) ) Hon. Amy J. St. Eve |
| TOM KULA and PAYMENTUS GROUP, INC., | ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendant Tom Kula ("Kula") has moved for summary judgment on Counts III, IV, and V of Plaintiffs Western Union Company and Western Union, LLC's (collectively "Plaintiffs" or "Western Union") Complaint alleging claims for misappropriation of trade secrets, breach of contract, and tortious interference with contract. (R. 86, Def's. Mem. of Law in Support of Mot. for Summ. J.) For the following reasons, the Court denies Kula's motion for summary judgment.

## BACKGROUND

This case arises from Defendant Kula's departure from Western Union and his alleged subsequent recruitment of Western Union clients for his new employer, Paymentus Group, Inc. ("PGI"). Western Union has sued Kula for misappropriation of trade secrets, breach of the non-compete and confidentiality provisions in his restrictive covenant contract, and tortious interference with Western Union's contractual relations with its customers. (R. 1, Compl.)[1]

---

[1] Subsequent to the filing of this motion, the Court granted Plaintiffs' Motion to Amend the Complaint. (R. 108.) Those amendments, however, are not relevant to this motion.

1

I.    **Kula's Employment at Western Union**

Kula initially began working at Western Union in 1993, and after a period during which he worked elsewhere, Western Union rehired him in October 2000. (R. 86, Ex. 1 Def.'s Statement of Facts ¶ 8.) Beginning in 2008, Kula was the Vertical Vice President, Payment Sales at Western Union. (*Id.* ¶ 9.) On May 9, 2016, Kula's supervisor, Michelle Young, gave Kula a written letter warning him that, due to the loss of two substantial Western Union clients, any future instances of "lost revenue, neglected client relationships, team leadership or any non-compliance with Company policies . . . will result in further disciplinary action up to and including the termination of your employment." (R. 86, Ex. 3 Warning Letter.) Carter Hunt was Young's supervisor, and he approved Young's delivery of the warning letter to Kula although he had never given a similar written warning to any other Western Union employee. (Def.'s Statement of Facts ¶¶ 13-14.)

Kula submitted his resignation on July 11, 2016. (*Id.* ¶ 15.) Kula claims that he notified both Michelle Young, his former supervisor, and Frank Lockridge, his supervisor at the time, that he was leaving for a non-sales position at PGI.[2] (*Id.* ¶ 15, Ex. 2 Kula Dec. ¶ 6.) Kula's last day of employment at Western Union was July 22, 2016, and after leaving Western Union, he began working at PGI as Vice President of Implementation Services. (Def.'s Statement of Facts ¶¶ 16, 18.) PGI initially offered Kula the position of Vice President of Sales, but he requested a different role. (R. 109, Ex. B Tom Kula Deposition 186: 13-24.) Regardless, at PGI, Kula reports to a senior manager responsible, at least in part, for the Sales Group. (*Id.* 125: 1-11, 172: 7-12.)

II.   **Kula's 2015 Restrictive Covenant Agreement**

---

[2] Western Union claims that Kula did not inform Young or Lockridge that he was going to work for PGI. Lockridge and Young have not testified, but Carter Hunt testified that Young and Lockridge did not know that Kula was going to work for PGI. (R. 109, Ex. A Carter Hunt Deposition 18: 10-17.)

During his term of employment at Western Union, Kula entered into multiple compensation and employment agreements. (Def.'s Statement of Facts ¶ 19.) The 2015 Restrictive Covenant Agreement ("2015 "RCA") includes various post-employment restrictive covenants, including obligations relating to confidentiality, non-solicitation, and non-competition. (*Id.* ¶ 20; *see also* R. 86, Ex. 6 2015 RCA.) The 2015 RCA provides that Delaware law governs its terms. (Def.'s Statement of Facts ¶ 22.) The 2015 RCA further states that the consideration Western Union provided for the RCA is "employment or continued employment," an award pursuant to the 2015 Long-Term Incentive Plan ("2015 LTIP"), and other "good and valuable consideration." (Def.'s Statement of Facts ¶ 23; *see also* 2015 RCA 1.)

The parties dispute whether Kula accepted the 2015 RCA. Western Union has not identified a physically signed copy of the 2015 RCA, and Kula testified that he did not physically sign the 2015 RCA or electronically accept it. (Def.'s Statement of Facts ¶¶ 25-27.) Western Union, on the other hand, claims that Kula accepted the RCA through its electronic signature process on May 13, 2016. (R. 109, Pls.' Resp. to Def.'s Statement of Facts 7: 27; Ex. C Tracy McKee June 20, 2017 Declaration ("McKee Declaration")[3] ¶ 4.) Western Union transitioned from ink signatures to electronic acceptance of RCAs and other agreements about 10 years ago. (Pls.' Resp. to Def.'s Statement of Facts 19: 4.)

When a Western Union employee receives a vested stock grant requiring acceptance of an RCA, the employee receives an email notifying him of this fact and providing instructions on

---

[3] There are two Tracy McKee declarations: (1) McKee's May 3, 2017 declaration submitted as an exhibit to Western Union's Motion for a Preliminary Injunction and (2) McKee's June 20, 2017 declaration, a more detailed declaration with new supporting exhibits, which Western Union submitted as an exhibit to its Opposition to Kula's Motion for Summary Judgment. For purposes of this motion, the "McKee Declaration," refers to the June 20, 2017 declaration. Kula argues that the Court should strike the June 20, 2017 declaration and its exhibits as untimely, but given the constant competing discovery disputes between the parties and the expedited discovery schedule pursuant to the preliminary injunction, the Court will, in its discretion, consider McKee's June 20, 2017 declaration for purposes of this summary judgment motion, which Defendant filed in advance of the preliminary injunction hearing. The Court notes that while McKee's two declarations contain different specific facts and exhibits, they both state that Western Union's internal records indicate that Kula accepted the 2015 RCA in May 2016.

how to accept the RCA. (Def.'s Statement of Facts ¶ 29.) Tracy McKee, Western Union's Compensation Director, testified that Merrill Lynch, the administrator of its benefits, sent Kula a notification that he had to accept the grant on its benefits website and that the stock award was subject to the terms and conditions of his award agreement. (McKee Declaration ¶ 10; Ex. 3 Notification of Grant Award.) Kula could only access his grant award using a unique username and password. (McKee Declaration ¶ 13.) Western Union has produced internal records indicating that Kula accepted a stock award of 3,295 units of Western Union stock and the 2015 RCA on the Merrill Lynch benefits website on May 13, 2016 at 3:26 PM. (Pls.' Resp. to Def.'s Statement of Facts 11: 34-35; R. 86, Ex. 9 Tom Kula Grant Award.) When he officially resigned from Western Union on June 22, 2016, his stock ceased to vest pursuant to the 2015 LTIP. (Pls.' Resp. to Def.'s Statement of Facts 7: 28.) Kula has never received any vested stock in connection with the 2015 RCA or 2015 LTIP. (Def.'s Statement of Facts ¶ 28.) Kula claims that there are no emails or screenshots demonstrating that he electronically accepted the RCA. (*Id.* ¶¶ 31-33.) Kula further contends that these records demonstrate only acceptance of the stock award and do not include any language stating that accepting the stock award required the acceptance of the RCA. (*Id.* ¶ 36.) Kula does not recall accepting the RCA. (Kula Deposition 13: 19-21.)

According to McKee, however, Merrill Lynch's benefits website requires[4] that employees open and accept the agreements associated with any stock award that they accept. (McKee Declaration ¶¶ 20-24.) The Merrill Lynch website prompts all employees to "view the

---

[4] Kula contends that the McKee Declaration and the exhibits to that declaration only described how the Merrill Lynch benefits system worked in 2017 for Colorado employees because McKee, a Colorado employee, only accessed the system at that time. (R. 114, Def.'s Resp. to Pls.' Additional Facts ¶¶ 8-9.) While Kula is correct that the June 20, 2017 McKee Declaration did not provide exhibits regarding the Merrill Lynch benefits system for Kula in May 2016, Western Union contends, and McKee has testified, that the Merrill Lynch platform had the same requirements regarding the viewing and accepting of agreements and stock awards in 2016 as it did in 2017. (R. 86, Def.'s Mem. of Law in Support of Mot. for Summ. J., Ex. 8 May 3, 2017 Tracy McKee Declaration ¶¶ 7-9.) The Court recognizes the parties' dispute regarding the evidence describing the Merrill Lynch benefits system, but for purposes of providing background, accepts McKee's description of the system in her June 20, 2017 declaration.

Grant Documents [including the RCA] before making a [stock award] election." (Pls.' Resp. to Def.'s Statement of Facts 20: 9.) Merrill Lynch's records demonstrate that Kula reviewed the RCA and other grant documents at approximately 3 PM on May 13, 2016. (McKee Declaration ¶ 23.) McKee testified that Merrill Lynch's system would not permit Kula, or any other employee, to accept their stock award without clicking a button and entering a password indicating that he accepted all the employment agreements. (*Id.* ¶¶ 25, 27.)

Additionally, when PGI was recruiting Kula, they asked him if he had any agreements with Western Union that would limit his employment with PGI. (Kula Deposition 15: 8-13.) In response, Kula provided PGI with the 2015 RCA. (*Id.* 16: 21-23.) Kula testified that he provided PGI with the 2015 RCA, but when he did so, he did not know if that agreement was valid or enforceable. (*Id.*)

The stock award Kula accepted on May 13, 2016 was provided pursuant to the 2015 LTIP. (Def.'s Statement of Facts ¶ 40.) The 2015 LTIP does not mention the 2015 RCA and it does not contain any language indicating that an employee must agree to the 2015 RCA as part of accepting a stock award. (*Id.* ¶ 39.) LTIPs from prior years included explicit language indicating that an employee had to accept an RCA before receiving a stock award, but the 2015 LTIP did not contain that language. (*Id.* ¶¶ 39, 41.) The 2015 RCA, however, explicitly references and incorporates the 2015 LTIP as consideration for its obligations. (*See* 2015 RCA 1 ("In consideration of employment or continued employment by the Company, the grant to Employee of an award pursuant to The Western Union Company 2015 Long-Term Incentive Plan (incorporated herein by this reference). . ."))

### III. Kula's 2016 Variable Compensation Plan

The 2016 Variable Compensation Plan ("2016 VCP" or the "Plan") provided for additional compensation for sales employees who met certain performance requirements. (*Id.* ¶ 42.) The 2016 VCP contained restrictive covenants that are separate from, but similar to, the 2015 RCA's restrictive covenants. (*Id.* ¶ 44.) The 2016 VCP, for example, used slightly different language to describe employees' obligations and also did not contain any non-competition obligations. (*Id.*) The 2016 VCP provided that "[a]pplicable state law governs the validity, construction, interpretation, administration, and effect of this Plan." (R. 86, Ex. 11 2016 VCP § 8.) The Plan also provided that it "cancels, supersedes and replaces all previous compensation plans or arrangements (either verbal or written) in which [the employee] previously participated." (2016 VCP 3.) Kula accepted the 2016 VCP and it was effective from January 1, 2016 until Kula left Western Union on July 22, 2016. (Def.'s Statement of Facts ¶¶ 47-49.) He repeatedly received payments pursuant to the Plan through the end of his employment with Western Union in June 2016. (*Id.* ¶ 48.)

## IV. Alleged Tortious Interference

Kula claims that Western Union has not identified any Western Union customers who breached their contracts with Western Union due to Kula's actions. (*Id.* ¶¶ 50-53.) Carter Hunt, however, testified that Western Union suspects that Kula interfered with its contractual relationship with at least one client, BFGW Investments. (Hunt Deposition 55: 10-15.) BFGW was one of Kula's accounts at Western Union, and PGI acquired BFGW as a client after Kula moved to PGI. (*Id.* 51: 14-20.) Western Union has not determined whether BFGW breached its contract with Western Union. (*Id.* 55: 16-23.)[5]

---

[5] Western Union asserts that it has not conducted full discovery on its tortious interference claim because the Court has only ordered limited discovery related to the preliminary injunction, and Western Union did not move for a preliminary injunction on the tortious interference claims. (Pls.' Resp. to Def.'s Statement of Facts 23: 20.)

# LEGAL STANDARDS

## I. Federal Rule of Civil Procedure 56

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986)); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000) ("The existence of a mere scintilla of evidence supporting a plaintiff's position is insufficient; there must be evidence on which a jury could reasonably find for the plaintiff."). In ruling on a motion for summary judgment, the court must consider the record as a whole, in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255.

The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that it is entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010). If the moving party demonstrates the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-movant must go beyond the pleadings and "set forth specific facts showing there is a genuine issue for trial." *Hannemann v. S. Door Cty. School Dist.*, 673 F.3d 746, 751 (7th Cir. 2012).

## II. Northern District of Illinois Local Rule 56.1

---

Western Union also notes that PGI's corporate representative refused to answer deposition questions about PGI's efforts to obtain business from Western Union customers. (*Id.* 23: 21.)

Northern District of Illinois Local Rule 56.1 governs how the parties identify material facts and potential disputed material facts. "The purpose of Rule 56.1 is to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination. It is the litigants' duty to clearly identify material facts in dispute and provide the admissible evidence that tends to prove or disprove the proffered fact." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). Local Rule 56.1(a) "requires the party moving for summary judgment to file and serve a 'statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law.'" *Id.* at 218 (citation omitted). "The non-moving party must file a response to the moving party's statement, and, in the case of any disagreement, cite 'specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Petty v. Chicago,* 754 F.3d 415, 420 (7th Cir. 2014) (citation omitted); *see also* L.R. 56.1(b)(3)(A). Local Rule 56.1(b)(3)(C) requires the non-moving party to file a separate statement of additional facts. *See Thornton v. M7 Aerospace LP*, 796 F.3d 757, 769 (7th Cir. 2015).

Local Rule 56.1 statements and responses should identify the relevant admissible evidence supporting the material facts – not make factual or legal arguments. *See Zimmerman v. Doran,* 807 F.3d 178, 180 (7th Cir. 2015). "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Curtis*, 807 F.3d at 218 (quoting *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir. 2009)). The Seventh Circuit "has consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." *Flint v. City of Belvidere,* 791 F.3d 764, 767 (7th Cir. 2015).

# ANALYSIS

## I. Counts III and IV

Western Union's Complaint bases both Counts III and IV on Kula's breach of the 2015 RCA. Kula argues that the Court should grant summary judgment in his favor on both counts because (1) Kula never executed the 2015 RCA and (2) the 2016 VCP superseded the 2015 RCA. The Court addresses each argument in turn.

### A. Kula's Alleged Acceptance of the 2015 RCA

Kula first argues that he never accepted the 2015 RCA. The parties do not dispute that Kula never physically signed the 2015 RCA, so this argument turns on whether there is a genuine factual dispute as to whether Kula electronically accepted the 2015 RCA and if so, whether this electronic acceptance was sufficient.

"Ordinarily one of the acts forming part of the execution of a written contract is the signing of it." *Russell v. Dart*, No. 14-CV-4683, 2015 WL 1502926, at *3 (N.D. Ill. Mar. 26, 2015) (citations and quotations omitted) *aff'd sub nom. Russell v. Cook Cnty.*, 661 F. App'x 443 (7th Cir. 2016). Electronic signatures and clicking "Accept," however, "are valid means of expressing assent to a contract." *Mikhak v. Univ. of Phoenix*, No. C16-00901 CRB, 2016 WL 3401763, at *6 (N.D. Cal. June 21, 2016). Courts typically find electronic acceptance of an agreement sufficient to support a valid contract where the party had "reasonable notice of the terms" of the agreement and manifested assent to the agreement by clicking "Accept." *Sgouros v. TransUnion Corp.*, No. 14 C 1850, 2015 WL 507584, at *4 (N.D. Ill. Feb. 5, 2015), *aff'd*, 817 F.3d 1029 (7th Cir. 2016).

Applying these rules, courts have found restrictive covenant agreements enforceable where the employee had to accept the agreement online to receive a stock award. In *ADP, LLC*

*v. Lynch*, No. 2:16-01053 (WJM), 2016 WL 3574328, at *4-5 (D.N.J. June 30, 2016), *aff'd*, No. 16-3617, 2017 WL 496089 (3d Cir. Feb. 7, 2017), for example, the plaintiff brought suit against the defendants for violating their restrictive covenant agreements, and the defendants argued that the agreements were not valid because they had not physically signed the agreements, they did not read the agreements, and because the plaintiff did not have screenshots indicating that the individual employees had accepted the agreements. The court rejected the defendants' arguments and explained that the defendants were required to acknowledge that they had read and accepted the restrictive covenants before accepting stock grants pursuant to their compensation plan. *Id.* at *4. The court found that the "clickwrap agreement"—an agreement that requires a computer user to affirmatively manifest assent to the terms of a contract by clicking an icon—was enforceable because the plaintiff alleged and witnesses testified "that an employee could not accept any stock grants until acknowledging that he or she reviewed all grant documents, including the Restrictive Covenants. . ." *Id.* at *4-5.

Similarly, in *Newell Rubbermaid Inc. v. Storm*, No. CV 9398–VCN, 2014 WL 1266827, at *2 (Del. Ch. Mar. 27, 2014), the plaintiff sought a temporary restraining order against its former employee to prevent her from violating non-solicitation and confidentiality agreements that were part of stock award agreements that it alleged she assented to through a clickwrap agreement on a third-party website. The court found that the agreements were enforceable because the third-party website included a box titled "Grant Terms and Agreement" that stated, "[y]ou must read your Grant Agreement and review the terms to continue," the agreement was available in a hyperlink, and to accept her stock award, the employee had to check a box that read "I have read and agree to the terms of the Grant Agreement." *Id.* The court rejected the employee's argument that the agreements were unenforceable because she did not read them,

noting that "she was presented with a fair opportunity to do so" and "even indicated through the checkbox that she did so." *Id.* at *8. The court also noted that there was nothing improper about conditioning the stock award grant on her acceptance of the restrictive covenants. *Id. See also Tabliabue v. J.C. Penney Corp.*, 15-cv-01443-SAB, 2015 WL 8780577, at *2 (E.D. Cal. Dec. 15, 2015) (finding that an electronic signature is sufficient to render a valid arbitration contract); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829 (S.D.N.Y. 2012) (finding clickwrap agreement enforceable where the agreement terms were readily available to the user, but there was no mechanism that forced the user to actually read them); *DeJohn v. The .TV Corp. Int'l*, 245 F. Supp. 2d 913, 920 (N.D. Ill. 2003) (finding consumer clickwrap agreement enforceable).

Here, Western Union has produced evidence that indicates that the third-party benefits system at issue in this case was very similar to those utilized in *Newell* and *Lynch*. Tracy McKee, Western Union's Compensation Director, testified that under Merrill Lynch's benefits system, the Merrill Lynch platform that Western Union employees had to use to accept their stock awards provided access to the RCA as well as other documents related to the stock award. (McKee Declaration ¶¶ 20-23.)[6] On the page containing the RCA, the website stated, "You must view the Grant Documents before making an election," and provided that by accepting the stock award, employees were accepting the Grant Documents, including the RCA, as well. (*Id.* ¶ 20.) While Kula argues that the 2015 RCA was misleadingly labelled "Illinois LLC," Merrill Lynch's website required that employees click the link to open each Grant Document before they could click "Accept" and move to the next page where they could complete the acceptance of their stock award by entering a unique password. (*Id.* ¶¶ 21-22.) Western Union employees would

---

[6] As noted above, Kula disputes that the Merrill Lynch system for a Colorado employee in 2017 was the same as it was for Kula, an Illinois employee, in 2016. While there may have been differences between the two systems, McKee has testified twice that the requirements for accepting a grant were functionally the same and required review of the grant documents, including the RCA.

11

not have been able to confirm the acceptance of their stock awards until they opened the RCA and as a result, even if the document's filename was not entirely clear, the employees would have been able to view the document and easily see that it was a restrictive covenant agreement. (*Id.*) Thus, here, like in *Newell* and *Lynch*, accepting McKee's description of the Merrill Lynch system, Western Union employees were presented with a "fair opportunity" to review the agreements and could not accept any stock grants until they had acknowledged that they had reviewed them. In fact, the Merrill Lynch system at issue here went a step further than the systems in *Newell* and *Lynch*, as the Merrill Lynch website required that employees physically opened each of the grant documents, including the RCA, in a separate window before they could move forward and confirm their acceptance of the stock award. (*Id.*) Accordingly, given McKee's testimony about the Merrill Lynch system and viewing the evidence in the light most favorable to Western Union, Kula has failed to show that there is no genuine dispute regarding whether Kula's RCA was an enforceable clickwrap agreement pursuant to Western Union employees' acceptance of their stock award.

Kula also argues that even if the 2015 RCA was an enforceable clickwrap agreement, Western Union has failed to show that Kula ever accepted the agreement. The parties agree that Kula did not physically sign the agreement, and Kula contends that Western Union cannot produce any screenshots of Kula's version of the Merrill Lynch website, and thus cannot show that he assented to the terms of the 2015 RCA. Kula has testified that he does not recall accepting the 2015 RCA either electronically or otherwise. In response, Western Union argues that its internal records indicate that Kula did accept the stock grants and the 2015 RCA on the Merrill Lynch benefits website, which only he could have done using his unique password, on May 13, 2016 at 3:26 PM, and that these records are sufficient to show that Kula assented to the

12

terms of the 2015 RCA. (Pls.' Resp. to Def.'s Statement of Facts 11: 34-35; R. 86, Ex. 9 Tom Kula Grant Award.) Kula has not presented any evidence in response that suggests that Western Union's records are false or incorrect. Indeed, when PGI was recruiting Kula, they asked for copies of any contracts that might restrict his employment, and Kula provided a copy of his 2015 RCA, suggesting that he was aware that he may have assented to it. Given these conflicting facts, and considering the record in the light most favorable to Western Union and drawing all reasonable inferences in favor of Western Union, Kula has failed to show that there is no genuine dispute of material fact regarding his acceptance of the 2015 RCA.

### B. The 2016 VCP Did Not Supersede the 2015 RCA

Kula next argues that even if the Court finds that Kula did accept the 2015 RCA, the 2016 VCP superseded and replaced all prior agreements, including the 2015 RCA, and therefore, the Court should grant him summary judgment on Western Union's claims premised on the 2015 RCA. In response, Western Union argues (1) that the 2016 VCP cannot supersede the 2015 RCA because Kula accepted the 2015 RCA in May 2016 *after* the 2016 VCP went into effect and (2) that the 2016 VCP was only intended to replace previous compensation plans not restrictive covenants and thus did not supersede the 2015 RCA.

In Illinois,[7] consistent with general contract law, the court's primary goal is "to give effect to the parties' intent as expressed in the terms of their written agreement." *Lewitton v. ITA Software, Inc.*, 585 F.3d 377, 379 (7th Cir. 2009). "Illinois courts apply the "four corners" rule," under which the court looks at the contract language to see if it is facially ambiguous. *Colagrossi v. UBS Sec., LLC*, No. 08 C 5471, 2014 WL 2515131, at *3 (N.D. Ill. June 4, 2014)

---

[7] The choice of law provisions in the 2015 RCA and the 2016 VCP are contradictory. The 2015 RCA provided that Delaware law governs, while the 2016 VCP provides that "applicable state law governs," which in this case would be Illinois law since Kula was a Western Union employee working and residing in Illinois. The parties do not argue, however, that any differences in the law between Delaware and Illinois are relevant here, and accordingly, the Court applies Illinois law, as both parties did in their briefs.

(citing *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999)). Where a compensation agreement contains an explicit provision stating that it supersedes any previous agreements, courts have found that the previous agreements are invalid and the agreement with the superseding term governs the employee's compensation. *Act II Jewelry, LLC v. Wooten*, No. 15 C 6950, 2016 WL 3671451, at *4 (N.D. Ill. July 11, 2016) (finding that plain and unambiguous language of an incentive agreement superseded and terminated the employee's earlier confidentiality agreement); *Colagrossi*, 2014 WL 2515131, at *3 (finding that previous compensation agreement was invalid because employee's written employment agreement discussed "compensation terms" and provided that it "supercede[d] [sic] any and all oral or written understandings regarding [his] employment").

Here, the unambiguous language of the 2016 VCP dictated that it superseded and replaced all previous compensation plans. The Plan provided that it "cancels, supersedes and replaces all previous compensation plans or arrangements (either verbal or written) in which [the employee] previously participated." (2016 VCP 3.) This clause explicitly applied to *all* previous compensation agreements, which, as multiple paragraphs in the 2016 VCP unambiguously made clear, included any and all "incentive compensation" plans or agreements to which the employee was a party. (*Id.* 3 (the VCP governs employee's "incentive compensation"), ¶¶ 3 ("not eligible to earn any incentive compensation"), 16 ("Participants . . . are excluded from participation in all other Western Union incentive plans")). This superseding clause would thus apply, in theory, to the 2015 RCA and the 2015 LTIP, which was consideration for the 2015 RCA and which was explicitly incorporated into that agreement.[8]

---

[8] The 2015 RCA explicitly references and incorporates the 2015 LTIP as consideration for its obligations. (*See* 2015 RCA 1 ("In consideration of employment or continued employment by the Company, the grant to Employee of an award pursuant to The Western Union Company 2015 Long-Term Incentive Plan (incorporated herein by this reference). . ."))

14

As noted above, however, the plain language of the superseding clause in the 2016 VCP states that it only applied to "*previous* compensation plans" in which the employee "*previously participated*." (*Id.* 3) (emphasis added.) The 2016 VCP was effective "commencing January 1, 2016," but, despite the 2015 included in their titles, the parties do not dispute that, if Kula agreed to the 2015 RCA and 2015 LITP at all, he did not do so until May 13, 2016, when Western Union's internal records show that he accepted his stock award. The 2015 RCA and the 2015 LTIP were thus not *previous* compensation plans because Kula had not *previously participated* in those plans since, if he assented at all, he did not assent to his participation in those agreements until May 13, 2016, five months after the 2016 VCP became effective. As a result, the 2016 VCP did not supersede the 2015 RCA or the 2015 LTIP, and those agreements were valid when Kula ended his employment at Western Union.[9] *W. Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co.*, 794 F.3d 666, 674 (7th Cir. 2015) ("An integration clause precludes consideration of *prior* and *contemporaneous* oral agreements; it says nothing about the parties' ability to amend or negotiate new contractual terms in the future.") (emphasis in original).

Accordingly, the Court denies Kula's motion for summary judgment as to Counts III and IV.

## II.  Count V

Kula next argues that the Court should grant summary judgment in his favor on Count V—Western Union's tortious interference with contracts claim—because Western Union has failed to show that any of its customers breached contractual agreements with Western Union or

---

[9] Kula argues that the 2015 RCA cannot be valid because the 2016 VCP superseded the 2015 LTIP, and thus the 2015 RCA, even if Kula agreed to it in May 2016, lacked valid consideration. This argument fails, however, because, as discussed above, the 2016 VCP did not supersede the 2015 LTIP or the 2015 RCA since Kula did not accept those agreements or the related stock award until May 2016. While Kula never received any vested stock because he left Western Union, had he stayed at Western Union he would have received a vested stock award under the 2015 LTIP.

that Kula caused any customers to breach any contracts. Western Union responds that (1) it has shown Kula may have interfered with at least one Western Union customer, and (2) the Court should deny Kula's motion because the parties have not completed discovery on this issue.

The Court denies Kula's motion for summary judgment as to Count V as premature. Western Union has only moved for summary judgment on Counts III and IV, and as such, the Court only ordered, and the parties have only engaged in, expedited discovery in relation to those counts. Indeed, Western Union has provided a declaration explaining that it has not yet completed the deposition of PGI's corporate representative on the subject of PGI's attempts to obtain business from Western Union customers and Kula's role in those efforts, in part because PGI's corporate representative refused to answer deposition questions on that subject. (Pls.' Resp. to Def.'s Statement of Facts 23: 20-21; Ex. E Declaration of Christine Hawes ¶¶ 6-7.) This declaration is sufficient to show that Kula's motion for summary judgment is premature, and accordingly, the Court denies Kula's motion for summary judgment as to Count V without prejudice.[10] Fed. R. Civ. P. 56(d) ("If a non-movant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: defer considering the motion or deny it. . .").

## CONCLUSION

For the foregoing reasons, the Court denies Kula's motion for summary judgment.

**DATED:** July 12, 2017　　　　　　　　　　　**ENTERED**

_____
AMY J. ST. EVE
United States District Court Judge

---

[10] Because the Court denies Kula's summary judgment motion on Count V as premature, it need not address at this time whether there is a genuine dispute as to Kula's tortious interference with Western Union's contracts with customers.

16